# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MATTHEW CRAGLE,** | : | **No. 3:07cv2132** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **WERNER ENTERPRISES, INC.,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

| | | |
|---|---|---|
| **RUSSELL WALPER,** | : | **No. 3:07cv2133** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **WERNER ENTERPRISES, INC.,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendant's motions for summary judgment in these two

related cases.  Having been fully briefed and argued, the matters are ripe for

consideration.

**Background**[1]

This case involves the alleged same-sex sexual harassment of the plaintiffs

_____

[1]The briefs and supporting documents filed by the parties in these two cases are nearly identical.  To avoid repetition and promote judicial economy, the court will consider Defendant Werner's motions for summary judgment in this single opinion.  Though the court's citations to the record will rely mostly on material from the Cragle case, the court will note where the material facts are different in relation to Walper.  The court emphasizes, however, that it has given equal consideration to the arguments and evidence supplied in the Walper case as it has for the Cragle case.

when they worked as "yard jockeys" driving trucks for Defendant Werner Enterprises.

Defendant Werner is a trucking company with a home office in Omaha, Nebraska. (Defendant's Statement of Material Facts in Cragle v. Werner (Doc. 23) (hereinafter Defendant's Statement) at ¶ 1). The events in question here took place at the Humboldt Industrial Park in Hazleton, Pennsylvania, where defendant maintains a facility. (Id.). The Hazleton facility is an off-site facility housed on the premises of a customer, Office Max. (Id. at ¶ 2). Office Max is the only customer served at that facility. (Id. at ¶ 3). Defendant maintains that the work schedule at this facility is based on Office Max's business needs. (Id. at ¶ 4).

Plaintiff Matthew Cragle began working for Defendant Werner on February 24, 2004. (Id. at ¶ 5). He worked as a "shag driver," also known as a "yard jockey." (Id.). Cragle started on the third shift. (Id. at ¶ 6). Cragle left employment with the company in October 2008. (Id. at ¶ 7). The parties dispute whether Cragle left voluntarily or was constructively discharged. (Id.; Plaintiff's Counterstatement of Material Facts in the Cragle Case (Doc. 34) (hereinafter "Plaintiff's Counterstatement") at ¶ 7). Plaintiff Russell Walper was hired by Werner as a "yard jockey" on March 8, 2004. (Defendant's Statement of Facts in the Werner Case (Doc. 23) (hereinafter "Defendant's Statement in Werner") at ¶ 8). He began working on the first shift at the Humboldt Industrial Park facility. (Id. at ¶ 9). Walper left his job in October 2008. (Id. at ¶ 10). Werner claims that Walper quit, while

Walper insists he was constructively discharge because of a hostile working environment. (Walper's Answer to Defendant's Statement of Facts (Doc. 34) (hereinafter "Walper's Statement") at ¶ 10). The position held by both Cragle and Walper, "shag driver," defendant insists, was exempt from overtime pay rules. (Defendant's Statement at ¶ 11). Plaintiffs contend that the company routinely paid for overtime hours until a policy change occurred. (Plaintiff's Counterstatement at ¶ 11).

Brenten Lavelle became plaintiffs' supervisor in September or October of 2004. (Defendant's statement at ¶ 12). Lavelle continued to supervise plaintiff until June 30, 2006, when he quit working for defendant. (Id. at ¶ 13).

Lavelle was not a popular supervisor. All of the drivers in the department, including Cragle and Walper, had problems with Lavelle from his first day on the job. (Id. at ¶ 14). Lavelle called in all the drivers on a Saturday and informed them that he didn't like the way the building was being run. (Id.). Lavelle promised that "big changes were coming down the road." (Id.). The parties disagree about whether Lavelle's mistreatment was directed at all the yard jockeys or was aimed particularly at Cragle and Walper. (Id. at ¶ 15; Plaintiff's Counterstatement at ¶¶ 14-15). Defendant points to statements made by various other yard jockeys that indicate Lavelle treated everyone badly. (Defendant's Statement at ¶¶ 15-19). Cragle himself testified that Lavelle "harassed all of the yard jockeys by yelling at them because they weren't doing anything, making them pick up garbage and not allowing

the yard jockeys to eat in the office." (Id. at ¶ 17). Bruce Knepper, a former yard jockey promoted to load planner, stated that Lavelle had a tendency to 'ride people' and make work brutal by ordering work when there was nothing to do. (Id. at ¶ 19). Knepper's complaints about Lavelle to the Omaha home office were not sexually related. (Id. at ¶ 20).

Cragle and Walper contend that Lavelle's behavior constituted sexual harassment. They point to several instances. Lavelle put his arm around Cragle in the office, squeezed his nipple and said, "boy, isn't he a really good looking boy?" (Plaintiff's Counterstatement at ¶ 15). Cragle had previously told Cragle not to do this, which implies that he had previously touched him. (Id.). Lavelle pinched Cragle's nipple on the veranda while others were smoking. (Id.). Twice between spring 2004 and August 2005, Lavelle approached plaintiff at lunch and asked him what he had to eat. (Id.). Lavelle then asked "you like that?" and grabbed plaintiff by the back of the head. (Id.). He said, "Here, why don't you try this. I'll give you something to eat." (Id.) Plaintiff saw Lavelle treat Walper in a similar way. (Id.). Lavelle also put his arms around Logan, another worker, and run his hand over his hair or the back of his neck. (Id.). After Cragle told Lavelle that his wife had injured her back, Lavelle said to him, "you should go home and tell that fucking bitch to get on her knees and suck your dick because she's not working, and this isn't no free ride." (Id.).

After Cragle filed a complaint to Werner about Lavelle's behavior, Cragle saw

Lavelle rubbing Walper's shoulders, and Walper resisting. (Id.). When Walper asked Lavelle if he could stay and assist Cragle with work requiring overtime, Lavelle responded that "you's two are a couple of homo hillbillies up here, aren't you." (Id.). Cragle also saw Lavelle order Walper to get under his desk and "get the ball." (Id.). Cragle also felt that Lavelle made homosexual advances on him by inviting Cragle to his home to drink, play cards, and swim in his hot tub. (Id.). Lavelle also grabbed Walper's nipples a couple of times per week, even after Walper resisted and told him to stop. (Id.). Even after they resisted the conduct, Lavelle persisted, touching one or the other on a daily basis. (Id.). Lavelle also pushed Walper's head into his crotch. (Id.). While other employees may have been treated badly by Lavelle, they were not subjected to the same sort of sexual behavior. (Id. at ¶ 16). Walper believed that Lavelle's advances were sexual in nature. (Walper's Counterstatement of Material Facts (Doc. ) (hereinafter "Walper's Statement") at ¶ 21).

The parties also dispute whether Walper ever asserted that he felt Lavelle's conduct constituted sexual advances. Walper filed a complaint with the Pennsylvania Human Relations Commission; he crossed out the word "advances" in the complaint because he did not consider that word to be truthful. (Defendant's Statement at ¶ 21). Cragle contends that Walper's testimony was equivocal, and that "When asked if Lavelle liked him in a sexual way or whether Lavelle was just fond of him as a friend, Walper replied, 'No, not in a fond way.' Walper testified, 'He thought I was cute, He always said I was a good looking guy. He would put his arms

5

around me.'" (Plaintiff's counterstatement at ¶ 21).  Besides grabbing Walper's nipples and forcing his head into his crotch, plaintiff also saw Lavelle attempt to rub Walper's shoulders and order him to get under Lavelle's desk and "grab the ball." (Id.).

Werner had an anti-harassment policy, which both Cragle and Walper received information about.  (Defendant's Statement at ¶¶ 27-28).  In August 2005 Cragle made a verbal complaint about Lavelle to Nikki Arends (Green) in Werner's Omaha, Nebraska Human Resources Department.  (Id. at ¶ 29).  Cragle contends that he also complained on behalf of Walper and Logan.  (Plaintiff's Counterstatement at ¶ 29).  The parties dispute whether Cragle mentioned Walper's complaints about Lavelle.  (Compare Defendant's Statement at ¶ 30; Plaintiff's Statement at ¶ 30).  Walper insists that he instructed Cragle to complain on his behalf.  (Walper's Statement at ¶¶ 29).  Arends conducted an investigation after receiving this complaint, and spoke with at least two persons Cragle had mentioned in their conversation.  (Defendant's Statement at ¶ 31).  Walper never contacted the Human Relations Department, but Cragle insisted that he had done so on Walper's behalf.  (Id. at ¶ 32; Plaintiff's Counterstatement at ¶ 32).  Arends contacted Matthew Guillaume, Operations Supervisor at the Hazleton faciility to inform him about the complaint.  (Defendant's Statement at ¶ 33).  Defendant insists that Guillame understood the complaint to be one of gross misconduct, but plaintiff insists that he had specifically complained to Arends of sexual harassment.  (Id. at ¶ 34; Plaintiff's

Counterstatement at ¶ 34).  Guillame had a conversation about complying with sexual harassment policies at Hazleton, making reference to the incidents involving Cragle, Walper and Logan.  (Plaintiff's Counterstatement at ¶ 34).

The parties dispute how seriously Defendant Werner took the allegations against Lavelle.  While defendant claims it acted to investigate and punish Lavelle, plaintiff contends that Lavelle received a discretionary pay raise within weeks of Werner's receiving the complaint.  (Id. at ¶ 36).  The company had discretion to terminate Lavelle after determining that the allegations were warranted, but did not do so.  (Id.).  Guillame also did nothing to discipline Lavelle after receiving Arends's report.  (Id.).  Werner did give Lavelle a written warning, informing him that he would be terminated if he repeated the behavior.  (Defendant's Statement at ¶ 37).  Lavelle received a written report describing inappropriate conduct on August 30, 2005.  (Id. at ¶ 38).

Werner did not reveal to Lavelle who made the complaint, though Guillaume concluded that Lavelle had decided plaintiff had done so.  (Id. at ¶ 40; Plaintiff's Counterstatement at ¶ 40).  Werner directed Lavelle to apologize to the entire office staff, including the yard jockeys.  (Defendant's Statement at ¶ 41).  He did so.  (Id.). Werner did not pay a bonus Lavelle was due to receive after the complaint, but did pay a bonus months later after Lavelle threatened to quit.  (Id. at ¶ 42).  The parties dispute the size of this bonus.  (Id.; Plaintiff's Counterstatement at ¶ 42).  Lavelle quit on June 30, 2006.  (Defendant's Statement at ¶ 43).

Werner spoke with Cragle three times regarding his complaint.  (Id. at ¶ 44).

Plaintiff contends that he complained to Arends and Guillaume that Lavelle's conduct

had continued, and that he found that conduct abusive and retaliatory.  (Plaintiff's

Counterstatment at ¶ 44).  Guillaume, plaintiff claims, counseled that they had to

expect Lavelle to be angry.  (Id.).  They should give him time to adjust to the

situation.  (Id.).  Guillame followed up in October 2005, but all of the Hazleton staff,

whether in the office or in the yard, were thinking of walking off the job because of

Lavelle's behavior.  (Id.).

The parties dispute whether Lavelle's conduct continued after Cragle

complained.  Defendant insists that it stopped.  (Defendant's Statement at ¶ 45).

Cragle alleges that Lavelle rubbed Walper's shoulders, which Walper resisted.

(Plaintiff's Counterstatement at ¶ 45).  Lavelle called Cragle and Walper a couple of

"homo hillbillies" after Walper asked to stay and assist Cragle on overtime work.

(Id.).  Lavelle also put his arm around Walper and called him a "good looking guy"

after the complaint.  (Id.).  Plaintiff also insists that Lavelle engaged in retaliatory

conduct after he made his complaint, changing shifts of those who complained

multiple times in one day.  (Id.).  Lavelle also began yelling at drivers when they

received radio calls in the office.  (Id.).  He also barred drivers from eating in the

office and made them eat next to a restroom.  (Id.).  Lavelle also attempted to

physically intimidate Cragle by pushing him around.  (Id.).  Werner had reduced the

number of yard jockeys from 8 to 6 before Cragle filed his complaint.  (Id.).  Cragle

8

and Walper desired to work first shift. Plaintiff contends that they desired to work together because they feared that Lavelle would find reasons to fire them if they worked separately. (Id. at ¶ 57). (Id. at ¶ 45). They made an agreement that they would return to first shift when Carl Logan left Werner and went to Florida. (Id.). Meanwhile, Frank Sciafane, who had less seniority than either Werner or Cragle, would be placed on first shift. (Id.). Werner and Cragle did not get placed on first shift when Logan left. (Id.). Cragle had filed his complaint, and Lavelle told him that he would not be transferred to first shift. (Id.). The parties dispute whether the new shift assignments were made on the basis of seniority or at the discretion of Lavelle. (Defendant's Statement at ¶ 55; Plaintiff's Counterstatement at ¶ 55).

All drivers were required to work fifty hours per week. (Defendant's Statement at ¶ 65). Werner apparently provided overtime pay to workers who worked more than forty hours a week, but Office Max eventually cut back on its compensation to Werner and Werner stopped paying overtime hours to drivers. (Id. at ¶ 66). The parties dispute whether Werner could and did use its discretion to pay workers overtime after the Office Max cutbacks. (Id. at ¶¶ 66-67; Plaintiff's Counterstatement at ¶¶ 66-67). Plaintiffs contend that Lavelle at times denied him overtime to punish him for his complaint, and that workers–including plaintiffs–were given overtime after this pronouncement. (Id. at ¶ 66).

Walper and Cragle testified that they did not know if Lavelle was a homosexual. (Defendant's Statement at ¶ 49). They knew, however, that he was

9

married while he was their supervisor. (Id. at ¶ 50). Cragle's only complaint against anyone at Werner was the one he made about Lavelle. (Id. at 51).

Plaintiff Cragle's complaint consists of four counts. Count I alleges sexual harassment in violation of Title VII of the Civil Rights Act of 1964. Count II alleges retaliation for reporting this violation of the federal civil rights laws. Count III raises a claim of sex discrimination and sexual harassment in violation of the Pennsylvania Human Relations Act (PHRA). Count IV is a claim of retaliation pursuant to the PHRA. Plaintiff Walper's complaint raises the same causes of action.

Defendant filed the instant motions for summary judgment on August 28, 2009. The parties then briefed the issues and the court hear oral argument, bringing the case to its present posture.

**Jurisdiction**

As this case is brought pursuant to United States Code Title 42 § 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Supplemental jurisdiction over the plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367.

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

10

entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Discussion**

11

The defendant seeks summary judgment on all of the plaintiffs' claims. The court will address each in turn.[2]

**a. Sexual Harassment**

**i. Quid pro Quo Harassment**

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicity a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals." Robinson v. City of Pittsburgh, 120 F.3d 1286, (3d Cir. 1997) (quoting 29 C.F.R. § 1604.11(a)(1)-(2)). This is a case of same-sex sexual harassment, which requires a different approach than other sexual-harassment inquiries. Courts have found that "there are at least three ways by which a plaintiff alleging same-sex sexual harassment might demonstrate that the harassment amounted to discrimination because of sex–the harasser was motivated by sexual desire, the harasser was expressing a general hostility to the presence of one sex in the workplace, or the harasser was acting to punish the victim's noncompliance with

---

[2]The court notes that cases brought pursuant to the PHRA bear the same legal standards as cases brought pursuant to federal anti-discrimination law. The court's opinions under federal law therefore apply equally to plaintiffs' state-law claims. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (concluding that in a case where plaintiff brought both ADA and PHRA claims "we will only discuss [plaintiff's] ADA claim because our analysis of an ADA claim applies equally to a PHRA claim.").

gender stereotypes." Bibby v. Coca-Cola Bottling Co., 260 F.3d 257, 264 (3d Cir. 2001). This list is not exhaustive, however, and "[b]ased on the facts of a particular case and the creativity of the parties, other ways in which to prove that harassment occurred because of sex may be available." Id. Still, "'whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex." Id. (quoting Onacle v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).

Defendant argues that plaintiffs cannot prove that the conduct about which they complain constituted discrimination because of sex, but can only show that the complained-of conduct had an offensive sexual context. Defendant contends that no evidence indicates that Lavelle was motivated by sexual desire, expressed a general hostility to the presence of one sex in the workplace, or acted to punish the plaintiff's noncompliance with gender stereotypes, and thus plaintiff cannot prevail on this claim. Lavelle's behavior, while lewd and obnoxious, were not sexual in the sense that they were connected to the acts to which they made reference.

As related above, however, both Cragle and Walper testified that they believed that Lavelle's conduct was motivated by sexual desire. Cragle suspected that Lavelle propositioned him by inviting him to his home, and Walper thought that Lavelle's inappropriate touching demonstrated sexual desire. While neither man accepted what they suspected were offers, such evidence indicates that Lavelle's

13

conduct was motivated by sex. Hence, though this testimony is somewhat equivocal, a jury could conclude that Lavelle's interest in the two men was sexual, and thus find that Lavelle's actions amounted to discrimination because of sex. That jury could thus conclude that Lavelle sexually harassed the plaintiffs. The court will deny defendant summary judgment on these grounds.

### ii. Hostile Environment

Defendant also argues that plaintiffs cannot make out a claim for "hostile environment" sexual harassment based on the facts in the record. While Lavelle's behavior may have been crude and insulting, it was not sexually motivated. Moreover, the conduct was not severe or pervasive. Defendant argues that plaintiffs have produced evidence of only five incidents of alleged harassment over a twenty-two month period, and that such behavior is too minimal to create a hostile environment. To prevail on a "hostile environment" claim, a plaintiff must prove five elements: "(1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the presence of respondeat superior liability.'" Kunin v. Sears Roebuck Co., 175 F.3d 289, (3d Cir. 1999) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). The conduct must be serious to create liability: "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same

14

sex and of the opposite sex.'" Faragaher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)(quoting Oncale, 523 U.S. at 81).  Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. at 788. Instead, the conduct must be so severe that it would "amount to a change in the terms and conditions of employment."  Id.

Determining whether a work environment is "'hostile' or 'abusive'" requires "looking at all the circumstances," including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  To be actionable, the conduct "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  The conduct in question must be more than "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  Id. at 788.  It must be so "extreme to amount to a change in the terms and conditions of employment."  Id.

A reasonable juror could conclude that Lavelle's behavior created a hostile environment.  As related above, a jury could conclude that Lavelle's behavior was motivated by sexual desire and was more than normal workplace teasing.  Moreover,

the behavior was aimed specifically at plaintiffs, frequent and ongoing during plaintiffs' employment under Lavelle. Walper and Cragle described more than just occassional incidents, but frequent degrading and sexually directed actions and comments. Walper testified that "it was almost on a daily basis that he was touching either me or Matt [Cragle] somehow." (Deposition of Russell Walper, Exh. 4 to Defendant's Exhibits to Statement of Facts in the Cragle Case (Doc. 24) (hereinafter "Walper Dep.") at 26). Lavelle twisted nipples, jammed heads into his crotch, and suggested that Walper crawl underneath his desk on several occasions. Both men suspected this behavior was motivated by sexual desire. Such behavior caused both plaintiffs to dread coming to work and to seek assistance from company management to end the problem. Walper testified he "was basically scared to death of" Lavelle. (Id. at 25). A jury could therefore find this conduct so severe and pervasive that it amounted to a change in the conditions of work. Summary judgment is inappropriate on these grounds.

### iii. Employer Liability

Defendant argues that even if a jury could find that Lavelle had engaged in sexual harassment of Cragle and Walper, no evidence exists by which Werner, as employer, could be liable. The Supreme Court has found that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a

defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1995). Still, "[n]o affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable assignment." <u>Id.</u> at 808.

The court will deny the motion on these grounds. First, a jury could conclude that defendant took a tangible employment action against the plaintiffs. As related above, evidence exists by which a jury could conclude that defendant limited the hours which plaintiffs could work and eliminated their opportunity to obtain overtime pay. While a jury could reasonably decide that changes in hours and wages were a result of the demands of Office Max, evidence also exists which would allow a jury to conclude that Lavelle aimed those cuts specifically at the plaintiffs after they spurned his advances and complained about his conduct. Even if a jury were to conclude that no tangible employment action occurred, that jury could still find employer liability. A jury could find that Cragle and Walper–through Cragle–complained about sexually harassing conduct from Lavelle using company reporting procedures. Rather than discipline Lavelle, the jury could conclude that Werner paid him a bonus

while only ordering a generic apology that did not address the persons specifically injured. Under those circumstances, no affirmative defense would be available to defendant. The court will therefore deny the motion on these grounds.

Plaintiffs contend that they could also show an adverse employment action by proving to the jury that they were constructively discharged. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Pa. State Police v. Suders, 542 U.S. 129, 141 (2004). Constructive discharge requires a court to ask: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Id.

Here, neither plaintiff quit working until long after Lavelle–the source of their discomfort and the adverse employment action–left defendant's employment. As related above, both plaintiffs left their jobs in October 2008, more than two years after Lavelle did. At his deposition, Cragle insisted that "after I filed my complaint with Werner, I was being harassed there, and I was until the day I left." (Deposition of Matthew Cragle, Exh. 2 to Exhibits to Defendant's Statement in Cragle case (Doc. 24) (hereinafter "Cragle Dep.") at 29-30). This alleged harassment came at the hands of the supervisors who replaced Lavelle, Anthony Newman and Greg Dietz. (Id. at 30). Cragle and Walper did not complain about these supervisors because Werner had not responded to their previous complaints. (Id. at 30-31). Cragle

testified that he and Walper "never talked about quitting, leaving together, but we did often talk about if we can find another job we would leave." (Id.. at 88). Cragle left when he found another job. (Id.). Walper testified that he left in 2008 "because . . . there was just no way that I was going to be able to remain employed there with the amount of harassment that I was undertaking." (Walper Dep. at 11). Walper contended that the harassment came from Newman and Dietz, and took the form of changed hours and "outlandish" new workplace rules. (Id. at 12). Most of these changes affected all of the yard jockeys, and Walper testified that he did not suffer "sexual harassment" after Lavelle left. (Id. at 12-13). Walper felt he and Cragle were "singled out" when supervisors enforced new rules regarding checking trailers. (Id. at 14).

The court finds that plaintiffs could not prove an adverse employment action by citing their alleged constructive discharges. Plaintiffs claim here is that they were sexually harassed. They admit, however, that the sexual harassment stopped after Lavelle left. Both continued working for defendant for two more years. This willingness to stay on the job indicates that they did not find conditions so unbearable that they quit, much less that another reasonable person in the same situation would have felt compelled to resign. Plaintiffs complain that new supervisors treated them badly, but concede that in most respects the changes to the work environment they experience was shared by their coworkers, whether they complained of harassment or not. While the work may have become harder,

"employees are not guaranteed stress-free environments and . . . discrimination laws 'cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). A jury could not find that the slights to which plaintiffs were exposed after Lavelle left defendant's employ were more than mere annoyances suffered in the general run of work. As such, plaintiffs could not prevail on their claim if it were based on constructive discharge and they may not proceed on that theory.

**b. Retaliation**

Defendant contends that summary judgment is appropriate on plaintiffs' retaliation claims. Title VII prohibits "an employer from 'discrimnat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)). To prevail on a retaliation claim under Title VII, a plaintiff must first make out a prima facie case, showing that "(1) she engaged in activity protected under Title VII; (2) the employer took adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). To qualify as "adverse," "the employer's actions must be harmful to the point that they could well dissuade a

reasonable worker from making or supporting a charge of discrimination." <u>Burlington</u>

<u>Northern</u>, 548 U.S. at 57. This provision "is not limited to discriminatory actions that

affect the terms and conditions of employment." <u>Id.</u> at 64. If the plaintiff makes out a

prima facie case, "the familiar *McDonnell Douglas* approach applies in which "'the

burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its

conduct and, if it does so, the 'plaintiff must be able to convince the factfinder both

that the employer's proffered explanation was false, and that retaliation was the real

reason for the adverse employment action." <u>Moore</u>, 461 F.3d at 342 (quoting

<u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997)).

### i. Prima Facie Case

Defendant argues that plaintiffs cannot make out prima facie cases. First,

defendant contends that plaintiffs did not have a good-faith belief that their claim was

about behavior banned by Title VII. Defendant contends that the incidents

complained about were not sexually based, but simply annoying incidents. Cragle

knew Lavelle was married and did not know if he was a homosexual. Thus,

defendant argues, plaintiffs lacked a subjective good faith belief that they had

engaged in protected activity. Moreover, given the conduct alleged by defendant, a

reasonable person would not believe that Lavelle's conduct constituted sexual

harassment. As a result, plaintiff did not engage in protected activity.

The court finds that a jury could reasonably conclude that Cragle engaged in

protected activity, complaining about what he viewed as sexual harassment from

LaVelle. Defendant appears to argue that plaintiffs, as a matter of law, cannot make out a retaliation claim unless the conduct about which they complained actually amounted to sexual harassment. The law, however, does not require that a plaintiff have actual knowledge of actual sexual harassment, but instead that the plaintiff "have an 'objectively reasonable' belief that the activity s/he opposes constitutes unlawful discrimination under Title VII." Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 322 (3d Cir. 2008). Thus, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Id. While a more nuanced understanding of the law may have caused Cragle to doubt whether LaVelle's behavior technically constituted sexual harassment, Cragle is not a lawyer. A jury could certainly conclude that he acted on an objectively reasonable and good-faith belief that LaVelle's repeated unwanted touching, sexual vulgarities and unwelcomed advances constituted sexual harassment and violated the law. A jury could therefore find that plaintiffs engaged in protected activity.

Defendant contends that no evidence exists by which a jury could conclude that Walper actually complained of any conduct. Moreover, they insist, even if Walper did complain, he did not complain about conduct that could constitute sexual harassment. The court finds that a question of fact exists as to whether Walper complained. As related above, Walper insists that he instructed Cragle to complain for him, and Cragle contends that he made clear to defendant that he was raising his

complaint for both men. Defendant disputes this evidence. The court finds that a jury could reasonably conclude that Cragle's complaint also named Walper as a complainant. For the same reasons that the court finds Cragle's complaint could constitute protected activity, the court finds that Walper's complaint could also fall in that category.

Defendant also argues that plaintiff cannot demonstrate that any adverse employment action was causally related to plaintiff's protected activity. First, defendant insists that no evidence exists that Lavelle knew who filed the complaint against him. Second, the decision to cut back hours came before plaintiff made his complaint, and was in response to Office Max's cost-cutting measures. The cut backs eliminated two other drivers and kept Cragle employed. Changes in pay were directed at all drivers, not just plaintiff.

The court will deny summary judgment on these grounds as well. A jury could find, based on the small number of employees in the yard and plaintiffs' resistance to Lavelle's actions, that Lavelle concluded that the complaint against him came from the plaintiffs. While a jury might find the defendant's reasons for cutting back plaintiffs' hours and assigning them to particular shifts to be related to cutbacks from Office Max, a jury might also conclude that defendant aimed different cutbacks at plaintiffs than at other workers. As such, summary judgment is inappropriate here.

Finally, the court finds that the allegedly retaliatory acts about which plaintiffs complain–assigning them to undesirable shifts, denying them overtime pay and

reneging on a deal to change shifts–are actions which a juror could conclude would dissuade a reasonable person from making or supporting a discrimination charge. The Supreme Court has found that a reassignment of job duties can support a retaliation claim, but "[w]hether a particular assignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Burlington Northern, 548 U.S. at 71 (quoting Oncale, 523 U.S. at 81). A reasonable person who found their hours changed and their pay reduced after complaining about a supervisor's alleged sexual harassment could be dissuaded from speaking again, and thus a juror could find the action materially adverse. See, e.g., Burlington Northern, 548 U.S. at 70 (finding that "two of [defendant's] actions amounted to retaliation: the reassingment of White from forklift duty to standard track laborer tasks and the 37-day suspension without pay."). Plaintiffs have therefore produced evidence sufficient to support a prima facie case of retaliation.

### ii. Legitimate non-discriminatory Reasons

If a plaintiff makes out a prima facie case of discrimination, defendant can rebut that case by citing legitimate non-discriminatory reasons for the employment decision. If the defendant articulates such reasons, then the burden falls on the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherancies, or contradictions in the employer's proffered reasons

24

for its action that a reasonable fact finder could rationally find them unworthy of credence." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994).

Defendant argues that it has legitimate non-discriminatory reasons for its employment decisions that plaintiffs cannot rebut. The legitimate non-discriminatory reason for the changes in shifts are cutbacks from Office Max and the need to eliminate drivers and rearrange shifts to accommodate the new demands. The limits to discretionary pay for working more than forty hours is of no matter, since drivers were required to work fifty hours anyway. These limits came because of Office Max cutbacks, not employer decisions, and they applied to all drivers, not just plaintiff. Defendant contends that plaintiff cannot draw these reasons into doubt, either through direct evidence or by demonstrating pretext.

The court finds that if a jury were to accept these reasons as the cause of defendant's materially adverse actions the defendant would satisfy its burden to provide legitimate, non-discriminatory reasons for the employment decisions. As such, the court must examine the third part of the burden-shifting test.

### iii. Pretext

When the defendant provides a legitimate, non-discriminatory reason for the employment action, the burden shifts back to the plaintiffs to prove by a preponderance of the evidence that defendants "explanations offered for its adverse employment decisions were merely a pretext for unlawful retaliation." <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 306 (3d Cir. 2007). A plaintiff can demonstrate pretext

25

"by exposing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997)).

The court finds that a question of fact exists as to whether the defendant's stated reasons for its employment decisions–limiting overtime and reneging on alleged promises to allow plaintiffs to work on particular shifts–were the actual reasons for these decisions. There is a temporal proximity between Lavelle's conclusion that plaintiffs had complained about him and the adverse employment actions. Moreover, Cragle testified that after Lavelle was informed of complaints about him, he told workers "in a sarcastic manner" that since some did not like how he ran things, "there's going to be a few more changes." (Cragle Dep. at 49). A jury could conclude from such evidence that the changes that Lavelle made in shifts and pay were motivated not by the employer's business needs, but by a desire to punish plaintiffs for complaining. Such a conclusion would allow plaintiffs to establish pretext. As such, the court will deny summary judgment on these grounds as well.

**Conclusion**

For the reasons stated above, the court will deny the defendant's motions for summary judgment except as they relate to plaintiffs' claims of constructive discharge. The court concludes that no evidence exists by which a jury could find that plaintiffs were constructively discharged from their jobs, and plaintiffs' may not

proceed under that theory.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MATTHEW CRAGLE,** | : | **No. 3:07cv2132** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **WERNER ENTERPRISES, INC.,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

| | | |
|---|---|---|
| | : | |
| **RUSSELL WALPER,** | : | **No. 3:07cv2133** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **WERNER ENTERPRISES, INC.,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 11th day of March 2010, the defendant's motions (Doc. 22 in Case 09cv2132 and Doc. 22 in case 09cv2133) for summary judgment are hereby **DENIED**. The Clerk of Court is directed to consolidate case 09cv2133 with case 09cv2132 for all further proceedings and to **CLOSE** case 09cv2133.

**BY THE COURT:**

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**